UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAKESHIA LANG,

          Plaintiff,

    v.

CAROLYN W. COLVIN,[1]

          Defendant.

Case No.  10-cv-03507-JCS

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT**

**Dkt. Nos. 15, 20**

## I.  INTRODUCTION

Plaintiff Lakeshia Lang seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability benefits under the Social Security Act.  Lang asks the Court to reverse the Commissioner's denial of benefits and remand with instructions to award benefits, or, in the alternative, for further administrative proceedings.  For the reasons stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES Defendant's Motion for Summary Judgment, reverses the decision of the Commissioner, and remands for determination of the onset date of Lang's disability.

## II.  BACKGROUND

### A.  Procedural Background

Lang applied for disability benefits on November 6, 2006, alleging that she had been disabled since August 18, 2006 due to HIV, a reading disorder, and partial hearing impairment. Administrative Record ("AR") at 126, 151.  The Social Security Administration denied Lang's

---

[1] Carolyn Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is therefore substituted for Michael Astrue as the Defendant in this action. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d). This Order refers to Colvin as the "Commissioner."

United States District Court
Northern District of California

claim on May 15, 2007, and affirmed the denial on reconsideration on October 31, 2007. *Id.* at 83, 91. Lang requested a hearing, adding a seizure disorder, borderline intellectual functioning, depression, and anxiety to her claimed impairments. *See id.* at 229. Administrative Law Judge Robert Wenten ("ALJ") held a hearing on May 4, 2009, and issued a decision on August 27, 2009 finding Lang not disabled. *Id.* at 22−29. The Social Security Administration Appeals Council denied Lang's request for review on July 10, 2010, finding no reason to review the ALJ's decision. *Id.* at 1−3.

Lang filed this action on August 10, 2010 under 42 U.S.C. § 405(g), which gives the Court jurisdiction to review the final decision of the Commissioner. The parties have filed cross motions for summary judgment pursuant to Local Rule 16-5. Dkts. 15, 20. This action was reassigned to the undersigned magistrate judge on June 30, 2014, and the parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

### B.   Lang's Background

#### 1.   Personal History

Lang testified that as a child, she was beaten by her mother, sexually abused by her mother's boyfriend, and subsequently placed in foster care, including multiple group homes. AR at 62−64, 335. She dropped out of high school due to pregnancy after completing ninth grade and had been in special education classes up to that point. *Id.* at 48, 55, 258. Lang had her first son at age 14; the child's father was more than ten years older than Lang. *Id.* at 46, 422. That child was raised by Lang's mother, and Lang testified that he was raped by a "man named James" at age 6 or younger. *Id.* at 65. Lang now has four children, some of whom have mental health issues. *Id.* at 46. At the time of the administrative hearing, three of Lang's children lived with their fathers; the location of her oldest child was unknown. *Id.* at 46−47.

Lang's employment history indicates that she has worked for a number of different employers, but has rarely been able to hold a job for an extended period. *See id.* at 134−46. As of the date of her hearing, she had last worked as a security guard, earning $10,095.27 in 2007. *Id.* at 135, 146.

Lang has been sporadically homeless, and at times lived in low-income housing, at

*United States District Court*
*Northern District of California*

homeless shelters, or with family members. *Id.* at 49−50, 258, 418. She testified that she is illiterate, but has developed strategies to hide her illiteracy in professional and social situations. [2] *Id.* at 56−61. She has worked in fast food service and as a security guard. *Id.* at 59. Lang "considers [her]self a hermit," does not have friends, and—when she has a place to live—does not go outside often. *Id.* at 73−74. She has received some assistance from family members, including her mother, her sister, and an aunt. *E.g.*, *id.* at 184, 257, 418.

### 2. Medical History

#### a. HIV

Lang was diagnosed as HIV positive in 2006 and has received treatment at the Santa Clara Valley Medical Center, the Oakland HCC clinic, and the Alameda County Medical Center, Highland Campus. *E.g.*, *id.* at 278, 343, 444−45. Medical records indicate that she has at times experienced symptoms and/or side effects of medication including fatigue, weakness, joint and pain, numbness, abscesses, bacterial infection, rashes, burning sensation, diarrhea, nausea, cough. *Id.* at 309, 312, 314, 319, 332, 343, 349, 391, 418, 445. Some treatment reports describe Lang's "clinical status" as "asymptomatic." *Id.* at 397. Since her diagnosis, Lang's CD4 count[3] has ranged from 619 in July 2007, *id.* at 287, to slightly over 350 in April 2009, *id.* at 438. Lang is afraid of other people's reactions to her HIV status. *Id.* at 73. She was at one point "adamant" that she would not disclose her status to a romantic partner, she resisted disclosing it to her children, and she now avoids intimate relationships. *Id.* at 75, 278, 280, 394, 422. Lang testified that she considered suicide after her diagnosis. *Id.* at 75.

Dr. Hahn X. Pham, serving as a medical consultant, reviewed Lang's HIV treatment records on October 30, 2007, and concluded that Lang was asymptomatic and could be assessed as "meidum to non0-severe [sic]." *Id.* at 416. As of April 2, 2009, Lang's "[v]iral load remain[ed] undetectable." *Id.* at 455.

#### b. Mental Impairments

---

[2] The evidence of Lang's literacy is unclear. During each of her two psychological evaluations, Lang was able to write a short sentence. AR at 259, 421.
[3] A patient's CD4 count is a standard measure related to the progression of HIV.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   The Administrative Record indicates that Lang's mental impairments include depression,

2   anxiety, a reading disability, fairly low IQ, and possibly auditory and visual hallucinations.  These

3   impairments are interrelated and are therefore discussed together below.  Although Lang's HIV is

4   discussed separately above, it is also related to her depression and anxiety.  *See id.* at 73−75

5   (testimony regarding anxiety and depression related to HIV).

6   Lang had difficulty reading while in school, was placed in special education classes, and

7   testified that she is illiterate.  *Id.* at 56−58.  She had suicidal thoughts as a teenager, has attempted

8   suicide multiple times, was hospitalized after each attempt, and was involuntarily held under

9   section 5150 of the California Welfare and Institutions Code after a suicide attempt in the 1990s.

10  *Id.* at 418, 422.  According to a psychological report, Lang attempted suicide most recently after

11  her HIV diagnosis in 2006.  *Id.* at 422.  Although she has at times been suicidal, Lang also

12  experiences anxiety based on a "fear of dying."  *Id.* (psychological report); *see also id.* at 54

13  (testimony).  The record indicates that Lang underwent two psychological evaluations, and that

14  some of her symptoms were assessed by a consulting psychiatrist.

15  i.   Evaluation by Dr. Roxanne Morse

16  Lang's first evaluation, by Dr. Roxanne Morse, Ph.D., took place on February 27, 2007.

17  *See id.* at 257−61.  Dr. Morse employed five procedures and tests: a "Complete Psychological

18  Evaluation," "Wechsler Adult Intelligence Scale III," "Wechsler Memory Scale III," "Bender-

19  Gestalt II," and the "Trail-Making Test."  *Id.* at 258.  Lang was able to perform some tasks and

20  tests adequately, but scored in the mid-70s on three IQ tests, indicating "Borderline Intellectual

21  Functioning."  *Id.* at 259.  She also scored "Very Low" on two tests of logical memory, and

22  demonstrated "marked impairment" on part B of the trail-making test, indicating "difficulties in

23  the area of sequencing ability, visual scanning speed, psychomotor speed, and the ability to make

24  cognitive shifts."  *Id.* at 259−60.  Dr. Morse concluded that Lang's auditory memory and "capacity

25  for mental tracking and sustained attention to task" were "markedly impaired," although she "was

26  able to maintain attention, concentration, pace, and persistence for the duration of the evaluation."

27  *Id.* at 260.

28  Lang denied a history of experiencing hallucinations.  *Id.* at 259.  Dr. Morse reported that

United States District Court
Northern District of California

1    Lang "was molested as a teenager which created a depression that resulted in a suicide attempt

2    when she was 15 years old," and that Lang had been held pursuant to California Welfare &

3    Institutions Code section 5150 "having cut her wrists." *Id.* at 258. Lang sucked her thumb

4    throughout Dr. Morse's examination. *Id.* at 257.

5                      ii.   Report by Dr. Charlotte Bible

6         Dr. Charlotte Bible, MD, serving as a medical consultant, prepared a Psychiatric Review

7    Technique and a Mental Residual Functional Capacity Assessment based primarily on Dr. Morse's

8    report. *Id.* at 261−77. Dr. Bible concluded that Lang's "borderline IQ score" constituted a

9    medically determinable impairment related to Listing 12.05 that "d[id] not precisely satisfy the

10   diagnostic criteria." *Id.* at 270. In the Residual Capacity Assessment, Dr. Bible checked boxes

11   indicating that Lang was "Moderately Limited" with respect to five categories, including "ability

12   to understand and remember detailed instructions," "ability to carry out detailed instructions," and

13   "ability to complete a normal workday and workweek without interruptions from psychologically

14   based symptoms and to perform at a consistent pace without an unreasonable number and length

15   of rest periods." *Id.* at 264−65. Dr. Bible indicated that Lang was "Not Significantly Limited" for

16   the remaining categories, including "ability to maintain attention and concentration for extended

17   periods." *Id.* at 264. Dr. Bible did not indicate that Lang was "Markedly Limited" for any

18   category, despite Dr. Morse's conclusions that Lang was "markedly impaired" in certain abilities.

19   *See id.* at 264−65.

20                      iii.   Evaluation by Dr. Ede Thomsen

21        Lang's second psychological evaluation took place on September 17, 2008, with Dr. Ede

22   Thomsen, Ph.D., a licensed clinical psychologist. *Id.* at 417. Dr. Thomsen administered ten

23   procedures to evaluate Lang.[4]  *Id.* at 420. Lang "endorsed mood congruent auditory and visual

24   hallucinations," including "seeing purple people." *Id.* at 419. Lang also "sucked her thumb often

25

26   ───────────────────

27   [4] Dr. Thomsen's ten procedures were: "Clinical Interview," "Repeatable Battery for the Assessment of Neuropsychological Status (RBANS)-Form A," "Trail Making A & B," "Clock Drawing Task," "Mini Mental State Examination (MMSE)," "Barona Estimate (IQ)," "Beck Depression Inventory (BDI-II)," "Beck Anxiety Inventory (BAI)," "Rorschach," and "Mental Status/Psychiatric Symptoms Sheet." AR at 420.

28

as a way to soothe her self much as small child would," as she had done during Dr. Morse's evaluation. *Id.* at 419; *see id.* at 257.

Based on tests and her interview, Dr. Thomsen concluded that Lang "has a severe deficit" in attention and concentration, with performance on the RBANS Attention Index "in the 1st percentile, which is in the extremely low range." *Id.* at 420. One of several tests supporting this assessment was Lang's inability "to subtract a string of sevens starting from 100." *Id.* Dr. Thomsen attributed this deficit to Lang's anxiety, depression, and below average intelligence, and concluded that it "interferes with her ability to make decisions, resolve problems, and manage daily affairs." *Id.* at 420, 427. Dr. Thomsen also determined that Lang was severely impaired with respect to executive functioning, memory, and visual/spatial abilities, citing specific examples of Lang's performance on the RBANS test in each of these areas. *Id.* at 420−21.

Based on Lang's performance on the Beck Depression Inventory, Dr. Thomsen determined that Lang "has severe depression." Id. at 422. Lang endorsed "not being able to get any pleasure from the things she used to enjoy, . . . blaming herself for everything bad that happens, [and] having thoughts of killing herself." Id. According to Dr. Thomsen, Lang's responses indicated that she "has lost most of her interest in other people or things, . . . does not have enough energy to do very much, sleeps most of the day, . . . finds it hard to keep her mind on anything for very long, and is too tired or fatigued to do most of the things she used to do." *Id.* Dr. Thomsen also determined that Lang was "experiencing severe anxiety," based on her Beck Anxiety Inventory results. *Id.*

Dr. Thomsen determined that Lang "is unable to accurately read social situations in ways that are important for accurate reasoning and sound judgment." *Id.* at 427. Dr. Thomsen reported that as a result of Lang's anxious hypervigilance, "mistrust and distance diminish[] her relationships." *Id.* at 424. Lang exhibited "evidence of some peculiar thinking about people," with "[i]nteractions and views of people . . . based more on imagination and preconceptions than on actual experiences with individuals." *Id.* Lang sees others in "somewhat dehumanized ways that can lead to judgments and opinions based solely on those limited views." *Id.* at 424−25. Dr. Thomsen wrote that overall, Lang "has an inaccurate understanding of people and personal

behaviors.  This leads to relationship and social problems." *Id.* at 425.  Lang's tendency "to retreat to fantasy when relating with others . . . would make relating to others, especially bosses and co-workers or anyone else in a position to judge her or place demands upon her, difficult." *Id.* at 427.

One paragraph of Dr. Thomsen's report assesses Lang's substance abuse history.  *Id.* at 419.  Because that paragraph factored heavily into the ALJ's assessment of Dr. Thomsen's report, it is reproduced here in full:

> Ms. Lang reported that she first drank alcohol at the age of 6 and last drank alcohol, in the form of a beer, two days prior to the evaluation.  The first drug she used was marijuana at the age of 12 or 13.  The last drug she used was crack two months ago.  She said she considers this to be a 'party drug.'  In the past she has 'experimented with' crystal, methamphetamine, 'E,' crack, crank, heroin, marijuana, and mushrooms.  She went on to report that she 'mainly' used 'weed, alcohol, and crack.'  Currently, she only drinks alcohol and smokes marijuana 'on occasion.'  She denied any current drug abuse.

*Id.*  In the conclusion of her report, Dr. Thomsen noted that Lang "has a history of drug use, but currently denies abuse, endorsing occasional use of alcohol and marijuana," and Dr. Thomsen diagnosed Lang with "Polysubstance Dependence in Sustained Partial Remission." *Id.* at 428.

iv.  Other Medical Evidence of Mental Impairment

Some of Lang's other medical records also reference her depression and other medical impairments. *See, e.g.*, *id.* at 391 (treatment record advising to "[p]lease always check for depression").  A registered nurse at the Alameda County Medical Center noted that Lang "needs to see a mental health provider" and referred her to the Schuman-Liles psychiatric clinic, where she was prescribed Seroquel, a drug commonly used to treat mental disorders including depression. *Id.* at 454−55 (referring to "Schuman and Lyles").

c.  Hearing Loss

In October 2004, Lang was evaluated by an audiologist who determined that Lang suffered from sensorineural hearing loss in both ears. *Id.* at 373.  The audiologist reported that Lang's hearing in her right ear was "WNL [within normal limits] sloping to a moderate hearing loss," and that her left ear was "WNL sloping to a severe HL." *Id.*  The audiologist concluded that Lang

United States District Court
Northern District of California

"would benefit from hearing aids." *Id.* Lang's request for hearing aids was approved in December 2004. *Id.* at 372. Lang received hearing aids in 2005, *see id.* at 342, 365, but lost them sometime before December 2008, *id.* at 430.

A second audiologist evaluated Lang in December 2008. That audiologist concluded that Lang experienced "[m]ild to moderately severe sensorineural hearing loss" in her right ear, and "[m]ild to severe sensorineural hearing loss" in her left. *Id.* at 430. The audiologist concluded that Lang's "hearing loss does not meet Medi-Cal criteria for hearing aids." *Id.*

### d. Other

The record includes some references to asthma and a seizure disorder, *e.g., id.* at 392, 426−27, but Lang's asthma and history of seizures are not well developed in the record and she has not pursued those afflictions as a basis for disability in her present Motion.

### C. The Administrative Hearing

In Lang's hearing brief, she claimed "five medically documented severe impairments: HIV+, Seizure Disorder,[5] Hearing Impairment, Borderline Intellectual Functioning, Depression, and Anxiety." AR at 229.

After admonishing Lang's counsel for late filing of Lang's hearing request, *id.* at 40−43, the ALJ began his examination of Lang with questions regarding her housing and income, *id.* at 44−46. Lang explained that she was not employed, that she received food stamps and general assistance payments, and that she was living in "Shelter Plus Care" low income housing. *Id.* Lang testified regarding her children and her educational history. *Id.* The ALJ asked if Lang had worked recently, and Lang responded that she had not, due to depression related to her HIV and the stress of her recent homelessness. *Id.* at 49−50. In response to questions about her HIV, Lang testified that she saw a doctor and regularly took medication. *Id.* at 50−53.

The ALJ then asked about Lang's drug use, and Lang responded that "basically [she] stopped everything," and had been "clean for almost a year and a half, almost two years." *Id.* at 53. Lang stated that although "sometime [she] do[es] get so depressed [she] do[es] want to die,"

---

[5] Lang's seizures are not discussed further in her hearing brief, at the hearing before the ALJ, or in her present Motion for Summary Judgment.

United States District Court
Northern District of California

she does not want to die from drugs or HIV.  *Id.* at 54.

Lang discussed her difficulties in school and her social isolation as a result of being placed in special education classes, and testified that she is illiterate.  *Id.* at 56−58.  The ALJ then asked Lang about her employment history, and Lang said that she had worked in security and in fast food service, but never received job training.  *Id.* at 58−60.  Lang testified that she tried to take night shifts as a security guard so that she could sleep at work, and because she was afraid that a more active daytime shift would expose her illiteracy.  *Id.* at 60−61.  Lang testified that she was fired from her last position as a security guard in 2007 for sleeping on the job, after receiving numerous warnings.  *Id.*

In response to questions from her attorney, Lang testified about the abuse she suffered as a child, including beatings by her mother and sexual assault by her mother's boyfriend.  *Id.* at 62−63.  Lang also testified to spending time in multiple foster families and group homes.  *Id.* at 63−64.  Lang became pregnant at age 13 and had a child at 14.  *Id.* at 64.  She testified that she did not have an abortion because her mother, who encouraged an abortion, also threatened to beat Lang as soon as she was no longer pregnant.  *Id.* at 64.  Lang surrendered her son to Lang's mother at age two so that he would not be placed in foster care.  *Id.* at 65.  Lang testified that while in Lang's mother's care, Lang's son was raped by a "man named James" when he was no older than six.  *Id.*

Lang's attorney then asked about Lang's HIV symptoms.  Lang testified that she sometimes experienced numbness in her fingertips and feet.  *Id.* at 65−66.  She experiences night sweats and chills, as well as weakness.  *Id.* at 67.  She also discussed the side effects of her medication.  Lang stated that Seroquel "slows down the world" and sometimes makes it "too damn slow" and hard for Lang to interact with people.  *Id.* at 67−68.  She testified that one of her HIV medications causes gas, and that the total volume and frequency of pills she needs to take contributes to her depression.  *Id.* at 69−70.  Lang also testified that she needs to take medication for back pain, and that she experiences joint pains as a result of HIV.  *Id.* at 70−72.  Early in the discussion of Lang's HIV symptoms, the ALJ reprimanded Lang's attorney for asking leading questions, and did not accept the attorney's argument that Lang's borderline intellectual

functioning justified latitude in her questioning.  *Id.* at 65−67.

Lang also testified to her social isolation, stating that she hides her HIV and illiteracy, considers herself a hermit, has no friends except God "because friends will . . . beat you down," and harbors fear of rejection in part due to her HIV.  *Id.* at 72−73.  She testified that she sometimes suffers from severe depression and does not want to go outside or anywhere, and that since receiving subsidized housing she did not "plan on going outside."  *Id.* at 73−74.

Lang stated that she has a scar on her arm from a suicide attempt, and that she considered suicide after her HIV diagnosis, when she did not leave her home for two weeks "because [she] felt like [her] life was over." Lang testified that her HIV prevents her from forming intimate relationships: with HIV, "you can't really get close to no man, no woman, because you're going to have to tell them eventually that you [are] sick."  *Id.* at 75.  She stated that "if you don't let them know . . . they could sue you or you could go to jail."  *Id.*

### D.   The ALJ's Analysis and Findings of Fact

#### 1.   Legal Standard for Determination of Disability

##### a.   <u>Five-Step Analysis</u>

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1).  A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The claimant bears the burden of proof in establishing a disability.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1520(a).  At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful

United States District Court
Northern District of California

activity." 20 C.F.R. § 404.1520(a)(4)(I). If she is, the Commissioner finds that the claimant is not disabled, and the evaluation stops. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied at this step. If it is determined that one or more impairments are severe, the Commissioner will next perform Step Three of the analysis, comparing the medical severity of the claimant's impairments to a compiled listing of impairments that the Commissioner has found to be disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled. Otherwise, the Commissioner proceeds to Step Four and considers the claimant's residual functional capacity ("RFC") in light of her impairments and whether she can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1560(b) (defining past relevant work as "work . . . done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it"). If the claimant can still perform past relevant work, she is found not to be disabled. If the claimant cannot perform past relevant work, the Commissioner proceeds to the fifth and final step of the analysis. 20 C.F.R. § 404.1520(a)(4)(v). At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of her impairments, age, education, and work experience, can perform other jobs in the national economy. *Johnson v. Chater*, 108 F.3d 178, 180 (9th Cir. 1997). A claimant who is able to perform other jobs that are available in significant numbers in the national economy is not considered disabled, and will not receive disability benefits. 20 C.F.R. § 404.1520(f). Conversely, where there are no jobs available in significant numbers in the national economy that the claimant can perform, the claimant is found to be disabled. *Id*.

b. Analysis of Mental Impairment

Where there is evidence of a mental impairment that allegedly prevents a claimant from

United States District Court
Northern District of California

working, the Social Security Administration has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment. *Clayton v. Astrue*, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing 20 C.F.R. §§ 404.1520a, 416.920a). These regulations provide a method for evaluating a claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(a). In conducting this inquiry, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the claimant's symptoms, and how the claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. § 404.1520a(c)(1). The ALJ must then assess the degree of the claimant's functional limitations based on the individual's impairments. 20 C.F.R. § 404.1520a(c)(2).

Although analysis under 20 C.F.R. § 404.1520a includes an assessment of the individual's limitations and restrictions, this is not a residual functional capacity assessment but rather a component of analyzing the severity of mental impairments at Steps Two and Three of the sequential evaluation process. SSR 96-8p. The mental residual functional capacity assessment used at Steps Four and Five requires a more detailed assessment in which the ALJ must address the various functions contained in the broad categories found in Paragraph B of the adult mental disorders listed in 12.00 of the Listing of Impairments. *Id.* The listings that are relevant to Lang's claimed mental disabilities are 12.04, 12.05, and 12.06.

Disorders related to depression are governed by Listing 12.04, for affective disorders. That listing provides in relevant part:

> Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

    a. Anhedonia or pervasive loss of interest in almost all activities; or

    b. Appetite disturbance with change in weight; or

    c. Sleep disturbance; or

    d. Psychomotor agitation or retardation; or

    e. Decreased energy; or

    f. Feelings of guilt or worthlessness; or

    g. Difficulty concentrating or thinking; or

    h. Thoughts of suicide; or

    i. Hallucinations, delusions, or paranoid thinking; or

[subparts A.2 and A.3 discuss symptoms of manic or bipolar syndromes];

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1. Repeated episodes of decompensation, each of extended duration; or

    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

United States District Court
Northern District of California

> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, Subpt. P, App. 1. Listing 12.06, for anxiety-related disorders, provides as follows:

> In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.
>
> A. Medically documented findings of at least one of the following:
>
> > 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
> >
> > > a. Motor tension; or
> > >
> > > b. Autonomic hyperactivity; or
> > >
> > > c. Apprehensive expectation; or
> > >
> > > d. Vigilance and scanning; or
> >
> > 2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
> >
> > 3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
> >
> > 4. Recurrent obsessions or compulsions which are a source of marked distress; or
> >
> > 5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
>
> AND
>
> B. Resulting in at least two of the following:[6]
>
> > 1. Marked restriction of activities of daily living; or

---

[6] Paragraph B of Listing 12.06 is identical to Paragraph B of Listing 12.04. As discussed below, the ALJ analyzed these together as the "Paragraph B criteria."

14

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

*Id.* Where the listings refer to "marked" limitations, "it means more that moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* at 12.00C.

Listing 12.05, for intellectual disability, is structured somewhat differently, and requires either (1) an IQ (whether verbal, performance, or full scale) below 70, with other signs of impairment needed depending on the score, or (2) such severe incapacity that standardized measurement is precluded. *Id.*

### 2. The ALJ's Five-Step Analysis

#### a. Step 1: Substantial Gainful Activity

The ALJ began his analysis by noting that Lang "worked as a security guard in the spring or summer of 2007," earning $10,095.27 after the alleged onset of her disability in 2006. AR at 24. The ALJ wrote that "[o]n direct confrontation the claimant did confirm this work activity." *Id.* The ALJ acknowledged, however, that Lang was not presently working at the time of the hearing, and thus moved on to the second step. *Id.*

#### b. Step 2: Severe Impairments

The ALJ determined that Lang "has the following severe impairments: HIV infection, a major depressive disorder, an anxiety disorder, and polysubstance dependence." *Id.* at 25.

With respect to Lang's HIV, the ALJ noted that Lang had a "fluctuating CD4 count, albeit never terribly low," and experienced joint stiffness "but little else of vocational significance and no medically determined cause for joint stiffness." *Id.* The ALJ cited an August 20, 2007

treatment report indicating that Lang did not experience neuropathy,[7] diarrhea, anorexia, or weight loss.  *Id.*  The ALJ acknowledged that Lang experienced night sweats and fatigue, and that Lang's Seroquel medication "made her sleepy," but noted that Lang did not take advantage of an opportunity to speak to a medical clinic staff member about modifying her prescription.  *Id.*  The ALJ also stated that Lang's "subjective reports of symptoms of HIV" included in her September 2008 psychological examination were "really not documented in the medical clinical records."  *Id.*  The ALJ nevertheless listed Lang's HIV infection and the effects of her medication as a severe impairment, acknowledging that they "may have some impact on her abilities."  *Id.*

The ALJ characterized Lang's "history of psychological problems" as "somewhat cloudy," noting that although she had been referred to a mental health clinic, there was no record of ongoing treatment for anxiety or depression.  *Id.*  Based on the September 2008 examination, the ALJ concluded that Lang had "at least a major depressive disorder and an anxiety disorder."  *Id.*

The ALJ also concluded that Lang suffered from polysubstance dependence, based on Lang's admission of "ongoing use of substances" at the September 2008 examination, although he noted that it was "probably not completely material to the determination of disability."  *Id.*

The ALJ acknowledged evidence of "sensoral-neural hearing loss," but concluded that Lang "seemingly was able to hear adequately at the hearing and had no specific difficulty understanding or responding to questions."  *Id.*  The ALJ also noted two evaluations documenting "below average or borderline cognitive skills, poor memory, and difficulty with sequencing and psychomotor speed."  *Id.*  The ALJ did not find that either Lang's hearing loss or her cognitive impairments constituted severe impairments.  *See id.*

Ultimately, the ALJ concluded that "the claim of physical disability is not well supported," but that Lang "appears to have a psychological impairment."  *Id.*

### c.  Step 3: Medical Severity

The ALJ found that Lang "does not have an impairment or combination or impairments that meets or medically equals one of the listed impairments," and could not be found disabled at

---

[7] Neuropathy is a disorder of the nervous system that can lead to pain, weakness, loss of sensation, or other symptoms.

United States District Court
Northern District of California

United States District Court
Northern District of California

this step based on her "history of non-compliance and the conflicting and sketchy medical record." *Id.* at 25−26.

In reaching that conclusion, the ALJ determined that Lang's "mental impairments are not of listing severity," based on the "paragraph B" criteria for listed mental impairments. *Id.* at 26. According to the ALJ, Lang had moderate limitations in activities of daily living, and slight limitations in social functioning. *Id.* For the third category (concentration, persistence, or pace), the ALJ determined Lang had "moderate limitations when dealing with complex or multistep tasks but appears to have no more than slight limitations with simple, repetitive one or two step tasks." *Id.* Finally, for the fourth category, the ALJ determined that Lang had experienced no extended episodes of decompensation. *Id.* The ALJ also found "no indication that the 'Paragraph C' of the mental listings are [sic] satisfied." *Id.*

Although the ALJ determined at Step 2 that Lang's HIV and the side effects of her medication constituted a "severe impairment," he did not address HIV or the relevant Listing (14.08) in evaluating the medical severity of her impairments. *See id.* at 25−26. The ALJ also did not specifically discuss how any combination of Lang's impairments compared to the listed impairments. *See id.* The ALJ's Step 3 analysis includes no citations to evidence in the record. *See id.* Because the ALJ did not find Lang disabled at Step 3, he proceeded to Step 4. *Id.* at 26.

### d.  Step 4: Residual Functional Capacity

The ALJ concluded that Lang "has the full range of work at all exertional levels," and that "physically, there is virtually nothing proven to restrict the claimant's functioning." *Id.* The ALJ discounted Lang's "claims of aches and pains and other constitutional issues" because there was "no documentation in the record showing a disease process or any organic changes to support these claims, beyond inference." *Id.* The ALJ also determined that although Lang "may experience some fatigue because of her HIV," and although Lang complained that her Seroquel medication caused additional fatigue, "[t]he claims of fatigue are not reflected on any regular basis in the records." *Id.*

The ALJ also considered the two psychological reports in the record. First, the ALJ found that Dr. Thomsen's September 2008 report to be not credible. The ALJ acknowledged that "[t]his

report paints a grim picture of a claimant who is quite significantly limited, with sub average scores in multiple areas of testing." *Id.* The ALJ focused, however, on a short paragraph discussing Lang's substance abuse history. *See id.* Dr. Thomsen wrote that Lang admitted using crack cocaine two months before the evaluation, and drinking alcohol and smoking marijuana "on occasion," but "denied any current drug abuse." *Id.* at 419. The ALJ characterized this as "not consistent" and "strange[]." *Id.* at 27. The ALJ also found Lang's denial of current drug abuse "quite inconsistent" with Dr. Thomsen's report that Lang "endorsed visual hallucinations in the form of purple people." *Id.* at 27, 423. The ALJ thus concluded that "the failure of the psychologist to discuss the interaction between substance abuse and the claimant's stated symptoms is a very serious problem and significantly erodes the credibility of the entire report." *Id.* at 27.

The ALJ then looked to Dr. Morse's 2007 psychological evaluation of Lang. He construed that report as indicating that "the claimant denied all substance abuse history." *Id.*[8] He went on to summarize the report as indicating "reasonably functional" mental status; IQ in the mid-70s; "quite poor" memory; "marked impairment" on Part B of the Trail Making Test; capacity to understand, remember, and carry out simple instructions; "moderate difficulty" with detailed and complex instructions; and unimpaired ability to interact with the public, supervisors, and coworkers. *Id.* The ALJ also noted that the report indicated "one suicide gesture which led to an involuntary hospitalization." *Id.*

Based on the ALJ's consideration of the evidence, he found "that the claimant's medically determinable impairments have not been proven to cause the alleged degree of symptoms and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible or consistent with the medical findings, to the extent that they are inconsistent with the above residual functional capacity assessment." *Id.* at 28.

The ALJ's analysis of the severity of Lang's impairment was somewhat muddled. After his summary dismissal of Lang's claim of fatigue and pains, but before discussing the

---

[8] The only reference to substance abuse (or lack thereof) in Dr. Morse's report is a line reading "<u>Substance Use History</u>: Unremarkable." AR at 258.

United States District Court
Northern District of California

psychological reports, the ALJ stated that analysis of a claimant's symptoms requires a two-step process: first, determining "whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and second, "evaluat[ing] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities." *Id* at 27. It is not clear from the ALJ's written decision which of these two steps he used to evaluate Lang's fatigue, pain, and mental symptoms.

Step 4 also includes an assessment of whether the claimant can return to past work. Here, the ALJ determined that Lang was not precluded by disability from returning to work as a security guard. *Id.* The ALJ noted that Lang had been fired for repeatedly sleeping while at work, but found the cause of her termination unrelated to disability because the ALJ was "unaware of the presence of a medically determinable impairment which causes the claimant to experience compulsive sleeping." *Id.* The ALJ also recognized that "psychological factors . . . might cause [Lang] to experience significant difficulty if complex demands are made upon her," but found "no evidence that that has actually happened." *Id.* The ALJ therefore determined that Lang was not disabled, but rather "showed little recognition of the fact that she might have some personal responsibility for getting to work and staying awake while there." *Id.*

e. Step 5: Ability to Perform Other Jobs in the National Economy

Having found Lang able to return to past work and thus not disabled at Step 4, the ALJ did not reach the issue of whether Lang was able to perform other jobs in the national economy. *See id.*

E. Motions for Summary Judgment

1. Lang's Motion for Summary Judgment

Lang filed a complaint seeking review of the ALJ decision by this Court, and moved for summary judgment on the grounds that five[9] of the ALJ's statements and findings were not based on substantial evidence.

---

[9] Lang presents these arguments under seven headings in her Motion. Two sets of similar arguments are grouped together below.

United States District Court
Northern District of California

United States District Court
Northern District of California

First, Lang contends that "the ALJ's statement that claimant did not confirm work activity in 2007 is not supported by substantial evidence." Pl.'s Mot. at 6 (capitalization altered throughout). Lang purports to quote the ALJ as stating that "[o]n direct confrontation the claimant did not confirm" her work as security guard. *Id.* at 7 (citing ALJ Decision at 3 (AR at 24)). This argument appears to be based on a misreading of the ALJ's decision: the ALJ actually wrote that "[o]n direct confrontation the claimant *did* confirm this work activity." AR at 24 (emphasis added). The Court therefore need not address this argument further.

Second, Lang disputes the ALJ's characterization that Lang's CD4 count was "never terribly low." Pl.'s Mot. at 8 (quoting AR at 24). Lang cites medical records showing that her CD4 count dropped to 354 in April 2009, *id.* (citing AR at 438) and evidence submitted to the Appeals Council showing Lang's CD4 count was at 352 around the same time period, *id.* (citing AR at 31).

Third, Lang disputes the ALJ's conclusions that "there is no evidence of neuropathy, diarrhea, anorexia or weight loss," and that Lang's "HIV symptoms are not really documented in the medical records." *Id.* at 8, 14 (quoting AR at 25). Lang cites medical records that she claims indicate weight loss, appetite disturbance, diarrhea, and pain, burning, and numbness that could be related to neuropathy. *Id.* at 8−9 (citing AR at 314−57, 444−54). Lang also points to medical records that she claims indicate other symptoms, including night sweats and fatigue (which the ALJ acknowledged Lang experience, AR at 25), and fevers, cough, insomnia, abscesses, difficulty swallowing, rashes, and nausea (which the ALJ did not discuss in his decision, *see generally* AR at 22−29). *Id.* at 8−10 (citing AR at 31−36, 278, 309−57, 444-55).

Fourth, Lang disputes the ALJ's conclusion that Lang "was seemingly able to hear adequately at the hearing and had no specific difficulty hearing or responding to direct questioning." *Id.* at 10 (quoting AR at 25). Lang cites two records of audiological evaluations showing Lang's hearing loss. *Id.* (citing AR at 373−76, 430−32). She also cites two instances of apparent misunderstandings between Lang and ALJ in the transcript of the administrative hearing. *Id.* at 11 (citing AR at 45, 47).

Fifth, Lang disputes the ALJ's finding that Dr. Thomsen's report lacked credibility, as well

as the ALJ's statement that Lang's "history of psychological problems . . . is somewhat cloudy." *Id.* at 11, 15 (citing AR at 25, 27).  Regarding Dr. Thomsen's report, Lang argues that Dr. Thomsen's statement that Lang "[c]urrently . . . only drinks alcohol and smokes marijuana 'on occasion,'" AR at 419, does not support the ALJ's conclusion that Lang "freely admit[ted] to . . . ongoing use of alcohol and marijuana," *id.* at 27, and is not inconsistent with Dr. Thomsen's note that Lang "denied any current drug abuse," *id.* at 419.  Pl.'s Mot. at 15−16.  Lang cites medical records from Lang's HIV treatment and the psychological evaluations by Dr. Morse and Thomsen as evidence that Lang's psychological impairments are documented in the administrative record. *Id.* at 11−14.  Lang also argues that the ALJ should not have relied on Lang's failure to seek psychiatric treatment to discount her psychological impairments.  *Id.* at 12 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).

## 2. Commissioner's Motion for Summary Judgment

The Commissioner has filed a Cross-Motion for Summary Judgment, asking the Court to affirm the ALJ's decision that Lang was not disabled.  The Commissioner does not respond to each of Lang's arguments separately, but rather argues that certain key aspects of the ALJ's decision were properly decided and supported by substantial evidence.

First, the Commissioner argues that the ALJ properly found that Lang "engaged in substantial gainful activity since her alleged onset date of disability."  Def.'s Mot. at 3 (citing AR at 24).  The Commissioner argues that Lang was not disabled during the first and second quarters of 2007 because she received payment for work as a security guard.  *Id.*

Second, the Commissioner argues that the ALJ properly considered the medical evidence. *Id.* at 3−6.  The Commissioner contends that Lang's CD4 counts were close to the normal range, and that no evidence in the record indicates "how a low CD-4 count translates into specific functional limitations."  *Id.* at 4.  The Commissioner cites treatment notes indicating Lang to be asymptomatic or lacking specific symptoms of HIV, and puts forward alternative explanations (not discussed in the ALJ's decision) for Lang's fatigue unrelated to disability—i.e., that Lang was forced to leave the shelter where she stayed early each morning and slept in her car.  *Id.* at 5 (citing AR at 322, 332, 337, 391−92).  The Commissioner also cites one of the same audiology

reports on which Lang relies, and contends that it weights against a finding of disability.

Third, the Commissioner argues that the ALJ properly determined that Lang's mental impairments did not meet or equal a listed impairment. *Id.* at 6. The Commissioner relies heavily on the report of Dr. Bible, a medical consultant, although the Commissioner acknowledges that "the ALJ assessed lesser limitations than those set forth by Dr. Bible." *Id.* at 6−7 (citing AR at 26, 257−70). The Commissioner notes that the ALJ's characterization of Lang's psychological history as "somewhat cloudy" was in the context of Step 2, where the ALJ ultimately determined that Lang's "major depressive disorder" and anxiety disorder constituted severe mental impairments. *Id.* at 7 n.6 (citing AR at 25).

Fourth, the Commissioner defends the ALJ's determination that Dr. Thomsen's report was not credible. *Id.* at 7−8. According to the Commissioner, "the ALJ reasonably found that Dr. Thomsen's conclusion that there was no current drug abuse was inconsistent with [Lang's] crack cocaine use within the last two months, and continuing, even occasional, marijuana and alcohol use." *Id.* at 8 (citing AR at 27, 419). The Commissioner also defends the ALJ's conclusion that Dr. Thomsen's failure to adequately consider whether drug abuse contributed to Lang's reported symptoms, including visual hallucinations, and "failure to assess whether [Lang] was intoxicated constitute specific and legitimate reasons for assigning little weight to that opinion." *Id.* (citing AR at 27).

Finally, the Commissioner argues that the ALJ properly found Lang to be "[n]ot [e]ntirely [c]redible," because "the ALJ g[ave] valid, specific reasons for the credibility finding." *Id.* at 9. The Commissioner states that the ALJ "noted [Lang's] inconsistent statements regarding her history of substance abuse." *Id.* (citing AR at 27). The Commissioner does not cite any other instances of the ALJ giving "valid, specific reasons" for finding Lang not credible. Instead, the Commissioner points to Lang's work as a security guard during the period she alleges she was disabled, but acknowledges that this was "not expressly noted by the ALJ in the context of his credibility analysis." *Id.* (citing AR at 24). The Commissioner also cites a lack of medical evidence supporting Lang's testimony regarding her symptoms. *Id.* at 9−10.

United States District Court
Northern District of California

### 3.  Lang's Reply

Lang filed a Reply in which she argues that the ALJ erred in (1) evaluating the medical record; (2) finding Lang not credible; (3) finding that Lang's impairments did not meet or equal a listing, in part due to failure to consider a combination of Lang's impairments; and (4) determining that Lang had a residual functional capacity that would allow her to work.  *See generally* Pl.'s Reply (Dkt. 21).

## III.    ANALYSIS

### A.    Legal Standard Under 42 U.S.C. § 405(g)

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence."  42 U.S.C. § 405(g).   Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence means "more than a mere scintilla," *id*., but "less than a preponderance."  *Desrosiers v. Sec'y of Health and Human Servs*., 846 F.2d 573, 576 (9th Cir. 1988).   Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when weighing the evidence and in reaching a decision.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).  In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits.  *See Garrison v. Colvin*, 759 F.3d 995, 1019−21 (9th Cir. 2014).

### B.    Credibility of Dr. Thomsen's Report

The Court finds Lang's argument that the ALJ improperly discredited Dr. Thomsen's report to be the strongest basis for reversing the decision below.  The ALJ addressed Dr. Thomsen's report at Step 4 of his analysis, concluding that what he viewed as internal inconsistencies "significantly erode[d] the credibility of the entire report."  AR at 27.  Because Dr.

United States District Court
Northern District of California

Thomsen's report informs multiple steps of the analysis, the Court will address its credibility before embarking on review of the ALJ's five-step analysis.

### 1. Legal Standard for Opinions of Examining Doctors

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."[10] *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence ." *Ryan v. Comm'r of Soc'l Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). The Ninth Circuit has recently emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick* [*v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).
>
> Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. See *Nguyen v. Chater*, 100 F.3d 1462, 1464

---

[10] Psychologists' opinions are subject to the same standards as physicians' opinions. *See* 20 C.F.R. § 404.1527(a)(2); *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (applying standards discussing physicians' opinions to evaluate an ALJ's treatment of a psychologist's opinion).

United States District Court
Northern District of California

> (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012−13 (footnote omitted).

If an ALJ has improperly failed to credit medical opinion evidence, a district court must credit that testimony as true and remand for an award of benefits provided that three conditions are satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Id.* at 1020.  Under such circumstances, a court should not remand for further administrative proceedings to reassess credibility.  *See id.* at 1019−21.  This "credit-as-true" rule, which is "settled" in the Ninth Circuit, *id.* at 999, is intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce delay and uncertainty facing claimants, many of whom "suffer from painful and debilitating conditions, as well as severe economic hardship."  *Id.* at 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398−99 (9th Cir. 1988).  A court may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act."  *Id.* at 1021.  A court may also remand for the limited purpose of determining when a claimant's disability began if that date is not clear from the credited-as-true opinion. *See House v. Colvin*, __ Fed. App'x __, 2014 WL 3398137, at *1 (9th Cir. July 12, 2014) (citing, *e.g.*, *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010)).  Outside of those circumstances, remand for further proceedings is an abuse of discretion if the credit-as-true rule establishes that a claimant is disabled.  *Garrison*, 759 F.3d at 1020.

## 2.   The ALJ Erred in Failing to Credit Dr. Thomsen's Report

Because Dr. Thomsen examined Lang, *see* AR at 420, Dr. Thomsen's opinion is entitled to substantial weight unless (1) the ALJ presented clear and convincing reasons to reject it, supported by substantial evidence, or (2) it was contracted by other medical opinions and the ALJ

1    provided specific and legitimate reasons to reject it, supported by substantial evidence.  *See Ryan*,

2    528 F.3d at 1198.

3         The ALJ took issue with Dr. Thomsen's treatment of Lang's substance use.  AR at 27.

4    According to the ALJ, Dr. Thomsen's note that Lang "denied any current drug abuse" was

5    inconsistent with Lang's admission that she used crack cocaine two months before her evaluation

6    with Dr. Thomsen, and that she occasionally used alcohol and marijuana.  *Id.* at 27, 419.  The ALJ

7    also found that Dr. Thomsen's failure to explicitly state that Lang was not intoxicated at the time

8    of the evaluation "significantly erode[d] the credibility of the entire report."  *Id.* at 27.

9         The ALJ did not identify any specific contradictions between Dr. Thomsen's report and

10   other medical opinions.  *See id.*  Dr. Thomsen evaluated Lang over a year after Dr. Morse

11   performed her evaluation and Dr. Bible prepared her consulting reports.  *See id.* at 257, 266, 267,

12   417.  Thus, to the extent that Dr. Thomsen identified more severe limitations than Drs. Morse and

13   Bible, any difference may simply reflect a change in the severity of Lang's impairment between

14   early 2007 and late 2008, and not a contradictory of opinion.[11]

15        Assuming *arguendo* that Dr. Thomsen's opinions were contradicted by Dr. Morse or Dr.

16   Bible, and thus would not require "clear and convincing evidence" to discredit, the ALJ still failed

17   to present "specific and legitimate reasons that are supported by substantial evidence."  *See Ryan*,

18   528 F.3d at 1198.  The ALJ's conclusion that Dr. Thomsen's report was internally inconsistent

19   rests on the assumption that no credible psychologist would consider occasional[12] use of alcohol

20   and marijuana to be something less than "drug abuse."  *See* AR at 27.  The ALJ also assumed that

21   no credible psychologist would consider use of crack cocaine two months before the evaluation to

22   be something less than "*current* drug abuse."  *See id.* (emphasis added).

23        The Court does not agree that Dr. Thomsen's summary of Lang's drug use was

24

25   ────────────────────

     [11] Lang's employment as a security guard at the time of Dr. Morse's evaluation tends to support a
26   conclusion that she was less impaired at that time than when Dr. Thomsen evaluated her in 2008.
     [12] The Commissioner's Motion appears to suggest that use "on occasion" implies a high degree of
27   use.  *See* Def.'s Mot. at 8 (citing "continuing, *even* occasional" substance use (emphasis added)).
     That interpretation is not consistent with Lang's description of her "occasional" alcohol use to Dr.
28   Thomsen.  *See* AR at 419 ("Ms. Lang reported that she . . . last drank alcohol, in the form of a
     beer, two days prior to the evaluation.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1   inconsistent, much less sufficient to discredit Dr. Thomsen's entire report. The Diagnostic and

2   Statistical Manual of Mental Disorders ("DSM") is the "standard text" of the American

3   Psychiatric Association. *See United States v. Cantu*, 12 F.3d 1506, 1512 (9th Cir. 1993). At the

4   time of Dr. Thomsen's evaluation, the most recent edition of the DSM defined "substance abuse"

5   as a "pattern of substance use leading to significant impairment or distress, as manifested by one

6   or more of" certain listed indicators of abuse. *See* Am. Psychiatric Ass'n, *Diagnostic and*

7   *Statistical Manual of Mental Disorders: DSM-IV-TR* at 198−99 (4th ed., text revision 2000). [13]

8   Thus, in the context of the mental health profession, occasional use of even illicit substances does

9   not inherently constitute "substance abuse" without the presence of other indicators. *See id.* As

10  for Lang's reported crack cocaine use, Dr. Thomsen's apparent differentiation between an

11  occurrence two months earlier and "current" abuse is not a legitimate reason to discount the

12  credibility of her report.

13      The ALJ also noted Dr. Thomsen's failure to specifically discuss "whether the claimant

14  was intoxicated at the time of the interview." AR at 27. There is no substantial evidence that

15  Lang was intoxicated during Dr. Thomsen's evaluation. The ALJ cited the fact that Lang

16  "reported seeing purple people," but in context that statement appears to refer to Lang recounting

17  hallucinations that she had experienced, not hallucinations she was presently experiencing at the

18  time of the interview. *See id.* at 419. Dr. Thomsen's report also takes into account the effects of

19  Lang's past drug use, diagnosing it as a factor contributing to possible organic brain damage

20  affecting Lang's visual and spatial abilities. *Id.* at 421. The fact that Dr. Thomsen was cognizant

21  of Lang's drug history but did not diagnose Lang's symptoms as effects of intoxication indicates

22  that Dr. Thomsen did not find Lang to be intoxicated at the time of the evaluation. Instead, she

23  specifically diagnosed Lang's disorders and past traumatic experience—not intoxication—as

24  causes of Lang's impairments. *See, e.g., id.* at 420 ("It appears that Ms. Lang's difficulties with

25

26  ───────────────

27  [13] The American Psychiatric Association has since published a new edition of the DSM that
    combines the previous diagnoses of "substance abuse" and "substance dependence" into a new
    category of "substance use disorders," which in its mildest form requires two to three symptoms
    from a list of eleven. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental*
28  *Disorders: DSM-5* at 483−85 (5th ed. 2013).

executive functioning are due to the disruptive effects of the severe depression and anxiety she is experiencing.").

"[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citations omitted). Here, the ALJ's speculation that Lang was intoxicated during Dr. Thomsen's evaluation was not supported by any medical opinion, and contradicts the diagnoses of Dr. Thomsen, a licensed clinical psychologist. Such conjecture is not a valid reason to discredit the report.

The Court finds that the ALJ failed to "set forth specific, legitimate reasons" for discrediting Dr. Thomsen's report. *See Garrison*, 759 F.3d at 1012. Under the credit-as-true rule, the Court therefore credits Dr. Thomsen's opinions in the analysis below to determine whether to remand for benefits.

### C.   Five-Step Analysis

#### 1.   The ALJ Properly Determined that Lang Was Not Engaged in Substantial Gainful Activity

At the first step of his analysis, the ALJ properly determined that Lang was not engaged in substantial gainful analysis at the time of the hearing, because she was not employed at that time. AR at 24.  However, the ALJ's determination that Lang was engaged in substantial gainful activity after the alleged onset of her disability was also supported by substantial evidence.  *See id.*  Lang testified that she was employed as security guard in 2007, and a record of her earnings indicates that she earned just over $10,000 that year.  *Id.* at 60, 146.  Lang's employment is substantial evidence that, for Social Security purposes, she was not disabled during the period she was employed.  *See* 20 C.F.R. § 404.1520(b) ("If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience.").

The ALJ properly proceeded to the second step of the analysis because he acknowledged that Lang was not employed at the time of the hearing, but if he had found Lang to be disabled at a later stage of his analysis, her employment in 2007 would support a finding that her disability did not begin until after that employment.

### 2.   The ALJ Properly Determined that Lang Had Severe Impairments

Under the Social Security Regulations, the second step of disability analysis looks to whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments. *Id.* at 404.1520(a)(4)(ii).  A "severe impairment" is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* at 404.1520(c).  The ALJ found that Lang had multiple severe impairments, specifically "HIV infection, a major depressive disorder, an anxiety disorder, and polysubstance dependence." *Id.* at 25.  Neither party challenges this determination, and each of these impairment is supported by substantial evidence in Lang's treatment records, with the possible exception of polysubstance dependence.[14]  The Court therefore finds that the ALJ properly proceeded to Step 3.  Before moving on to that step, however, the Court considers whether the ALJ should have included additional impairments beyond the four that he found to be severe.

The ALJ did not list hearing loss as a severe impairment, and the Court finds this omission to be supported by substantial evidence.  Lang disputes the ALJ's conclusion that Lang "was seemingly able to hear adequately at the hearing," Pl.'s Mot. at 10 (quoting AR at 25), but even assuming that Lang misheard the ALJ in the two exchanges that Lang points to in the hearing transcript, *see* AR at 45, 47, two misunderstandings in a 45 minute conversation do not evince a severe impairment.  The audiological evaluations that Lang cites also fall short—a diagnosis of hearing "[within normal limits] sloping to severe," *id.* at 373, or "mild to severe sensorineural hearing loss," *id.* at 430, without any explanation of what practical effects should be expected, is too vague to establish significant limitation of basic work activities.

---

[14] There are two pieces of evidence related substance abuse in the record.  One is Lang's testimony that she previously used drugs but stopped because she did not want to "add fuel to the fire with this HIV" and did not want to die from drug use. AR at 53−54.  The other is Dr. Thomsen's report that discussed Lang's past drug use and "occasional" marijuana and alcohol use, and diagnosed Lang with "Polysubstance Dependence in Sustained Partial Remission." *Id.* at 419, 428.  The ALJ did not explain what evidence suggested that Lang was "significantly limit[ed] [in her] physical or mental ability to do basic work activities" as a result of polysubstance dependence.  *Cf.* 20 C.F.R. § 404.1520(c).  But since neither the ALJ nor this Court views polysubstance dependence as "completely material to the determination of [Lang's] disability," AR at 25, the Court need not decide whether the ALJ's finding that it was a "severe impairment" was supported by substantial evidence.

The ALJ also did not list Lang's cognitive limitations as a severe impairment.  The Court finds that this omission lacked substantial evidence.  Each doctor who assessed Lang's mental impairment noted at least some degree of cognitive limitation.  Dr. Morse assessed Lang's "overall level of cognitive functioning [as falling] in the low average range," and found her "capacity for mental tracking and sustained attention to task . . . markedly impaired."  AR at 260.  Dr. Bible, reviewing Dr. Morse's report, listed Lang's "Borderline IQ Score" as a medically determinable impairment warranting a functional capacity assessment.  *Id.* at 266, 270.  Dr. Thomsen, based on her own later evaluation, estimated Lang's IQ to be below average, diagnosed Lang's executive functioning as "severely impaired," and attributed Lang's "severe deficit" in attention and concentration in part to "her below average intellectual functioning."  *Id.* at 420.  Dr. Thomsen concluded that Lang's intellectual limitations would contribute to difficulty completing work-related tasks.  *See id.* at 427.  In light of the medical opinions in the record, the ALJ erred in failing to list intellectual disability as at least one of a combination of impairments causing significant limitation.

### 3.  The ALJ's Determination That Lang's Impairments Did Not Meet or Equal a Listed Impairment Lacked Substantial Evidence

Properly crediting Dr. Thomsen's opinion, the Court finds that Lang's impairments meet or equal the criteria for Listing 12.04: Affective Disorders, and that the ALJ's conclusion to the contrary lacked substantial evidence.  That Listing requires both (1) symptoms of depressive, manic, or bipolar disorder under Paragraph A, and (2) two of the four limitations listed under Paragraph B.[15] 20 C.F.R. § 404, Subpt. P, App. 1.  Lang meets both of these criteria.

#### a.  12.04, Paragraph A: Symptoms of Depression

The ALJ made no findings regarding the Paragraph A criteria because he began his analysis with Paragraph B.  *See* AR at 26.  A depressive syndrome under Paragraph A requires at least four of the listed symptoms.  20 C.F.R. § 404, Subpt. P, App. 1.  The record indicates that Lang exhibited at least six: loss of interest in almost all activities, sleep disturbance, decreased

---

[15] An affective disorder can alternatively be established by meeting the criteria of Paragraph C, which the ALJ properly concluded were not satisfied in this case.  *See* AR at 26.

United States District Court
Northern District of California

United States District Court
Northern District of California

energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide.  *See id.* at 12.04A(1)(a), (c), (e)−(h).

Lang experienced a pervasive loss of interest in almost all activities, as demonstrated by her testimony, Dr. Thomsen's report, and a Function Report prepared by Lang's mother.  Lang testified that she considers herself a "hermit," doesn't go outside, and "just want[s] to sit still."  AR at 73−74.  Dr. Thompsen reported that Lang "is not able to get any pleasure from the things she used to enjoy" and "has lost most of her interest in other people or things."  *Id.* at 422.  Lang's mother wrote that Lang's only hobby or interest is church, Lang no longer goes fishing or to family events, and Lang no longer likes malls or movies.  *Id.* at 186−87.  Other than her mother's statement that Lang attends church, there is no evidence in the record indicating that Lang has maintained her interest in any activities.

Lang's sleep disturbance, consisting of insomnia and night sweats, is documented in the record, including hospital treatment records, *e.g.*, *id.* at 445, Dr. Thomsen's report, *id.* at 422, and her own testimony, *id.* at 67.[16]  The ALJ acknowledged Lang's night sweats.  *Id.* at 25.

Lang's decreased energy is also documented in hospital treatment records, *id.* at 445, Dr. Thomsen's report, *id.* at 422, 427, and her own testimony, *id.* at 73−74.  The ALJ acknowledged Lang's fatigue.  *Id.* at 25.

Lang experiences feelings of guilt or worthlessness, as documented in Dr. Thomsen's report.  Lang "feel[s] quite guilty most of the time [and] blam[es] herself for everything bad that happens."  *Id.* at 422.  "A sense of guilt and inferiority to others is a strong part of her self-concept, [and an] underlying and chronic sense of inadequacy pervades."  *Id.* at 424.

Lang's difficulty concentrating and thinking are reflected in the reports of the two evaluating psychologists, Drs. Morse and Thomsen.  Dr. Morse wrote that Lang's "sustained attention to task" was "markedly impaired."  *Id.* at 260.  Dr. Thomsen found a "severe deficit" in attention and concentration, caused in part by Lang's depression.  *Id.* at 420−27.

---

[16] Although Lang's sleep disturbances and fatigue are frequently characterized as a symptom of her HIV, the ALJ properly recognized Lang's HIV as an impairment, and it may serve in combination with the effects of her depression to "equal" the listing for affective disorders.  *See* 20 C.F.R. § 404.1520a(4)(iii).

United States District Court
Northern District of California

1    Finally, Lang experiences thoughts of suicide that appear to recur chronically.  Dr.

2    Thomsen wrote that these thoughts date to when Lang was in her teens, that they recurred most

3    recently two days before her evaluation, and that she has attempted suicide multiple times, most

4    recently in 2006.  *Id.* at 418, 422.  Dr. Morse also reported that Lang attempted suicide at age 15,

5    although Lang "denied experiencing current suicidal . . . ideations" at the time of that examination,

6    *id.* at 258, and Lang testified to attempting suicide and having suicidal thoughts, *id.* at 54, 74.

7    Because Lang exhibited four or more of the symptoms listed, she meets the criteria for

8    Paragraph A of the Listing.  The remaining inquiry is whether she also satisfied Paragraph B.

9              b.   12.04, Paragraph B: Functional Effects of Affective Disorder

10   Paragraph B of Listing 12.04 requires "marked" limitations (or repeated, extended

11   episodes of decompensation) in at least two of four listed categories.  20 C.F.R. § 404, Subpt. P,

12   App. 1.  Without citing any evidence in the record, the ALJ determined that Lang's impairment(s)

13   did not satisfy Paragraph B because she had moderate limitation in activities of daily living, slight

14   limitation in social functioning, moderate limitation in concentration, persistence, or pace when

15   dealing with complex or multistep tasks (but "no more than slight limitations with simple,

16   repetitive one or two step tasks"), and no extended episodes of decompensation.  *Id.* at 26.  The

17   ALJ provided no explanation for these conclusions.  *Id.*  The Court finds that the ALJ lacked

18   substantial evidence with respect to Lang's limitations in social functioning and concentration,

19   persistence, or pace, and that Lang instead had marked limitations in those areas, satisfying the

20   requirement of Paragraph B.

21              i.   Social Functioning

22   "Social functioning refers to [a claimant's] capacity to interact independently,

23   appropriately, effectively, and on a sustained basis with other individuals."  20 C.F.R. § 404,

24   Subpt. P, App. 1, at 12.00C(2).  The Social Security Regulations' examples of impaired social

25   functioning include "avoidance of interpersonal relationships, or social isolation," and the Social

26   Security Administration considers a claimant's "cooperative behaviors, consideration for others,

27   awareness of others' feelings, and social maturity."  *Id.*

28   Dr. Thomsen's report demonstrates Lang's marked impairment in this area.  For example,

Dr. Thomsen wrote that Lang "has lost most of her interest in other people or things," indicating social isolation.  AR at 422.  This is consistent with Lang's testimony to the ALJ that she has "no friends" and "do[es]n't talk to a lot of people."  *Id.* at 73.  There is no evidence in the record of Lang maintaining friendships, and her relationships with family members appear to be inconsistent.

Dr. Thomsen's report also indicates that Lang lacks awareness of others' feelings.  Lang "is unable to accurately read social situations in ways that are important for accurate reasoning and sound judgment," and "mistrust and distance diminish[] her relationships."  *Id.* at 424, 427.  Lang exhibited "evidence of some peculiar thinking about people," with "[i]nteractions and views of people . . . based more on imagination and preconceptions than on actual experiences with individuals."  *Id.*  Lang can exhibit "poor judgment and inappropriate communications or behaviors" as a result of lacking "effective social or verbal skills."  *Id.* at 425.  Dr. Thomsen wrote that Lang's "inaccurate understanding of people and personal behaviors . . . leads to relationship and social problems," *id.* at 425, and that Lang's tendency "to retreat to fantasy when relating with others . . . would make relating to others, especially bosses and co-workers or anyone else in a position to judge her or place demands upon her, difficult."  *Id.* at 427.

Lang's approach to informing sexual partners of her HIV status also suggests social isolation and a lack of effective social functioning.  Treatment notes indicate that Lang was "adamant" that she would not inform a romantic partner that she was HIV positive.  *Id.* at 280.  By the time of the hearing, Lang appears to have accepted the importance of disclosure, and resolved to avoid intimate relationships rather than disclose her HIV status.  *Id.* at 75.  Lang accepted that she must disclose her HIV status to partner not out of "consideration for others," *see* 20 C.F.R. § 404, Subpt. P, App. 1, at 12.00C(2), but rather "[b]ecause if you don't let them know . . . they could sue you or you could go to jail."  AR at 75.

There is little evidence in the record to support the ALJ's conclusion that Lang had only "slight" limitation in social functioning.  Dr. Morse observed that Lang was "pleasant and cooperative" and "able to interact appropriately with [Dr. Morse]," and thus concluded that Lang's "ability to interact with the public, supervisors, and coworkers appears to be unimpaired."  *Id.* at

259−60.  Based on Dr. Morse's evaluation, Dr. Bible indicated that Lang was only "moderately limited" in her "ability to interact appropriately with the general public," and experienced "moderate" difficulties in maintaining social functioning.[17]  *Id.* at 265, 275.  But Dr. Morse included a disclaimer that her report "was based on only 1 session of client contact, in a structured environment and with pre-authorized tests," and that "[b]ackground and correlative information was considered to be limited."  *Id.* at 260.  Dr. Morse also appears to have focused her evaluation primarily on cognitive limitations rather than depression or other affective disorders.  *See id.* at 257 ("The claimant states that she is disabled because she is 'hearing impaired, HIV, and reading.'" [sic]); *id.* at 258 (listing test procedures).  Dr. Thomsen, while also apparently limited to a single evaluation of Lang, conducted tests specific to depression, anxiety, and emotional functioning, and thus addressed Lang's social limitations in significantly more depth.  *See id.* at 420 (listing tests); *id.* at 422−27 (analyzing emotional functioning, interpersonal relationships, and related limitations).

Because this factor looks to whether the claimant can maintain appropriate social interaction "*on a sustained basis* with other individuals," 20 C.F.R. § 404, Subpt. P, App. 1, at 12.00C(2) (emphasis added), Dr. Morse's observation that Lang was able to behave appropriately during her evaluation carries limited weight.  Properly crediting Dr. Thomsen's report, and considering other indications in the record that suggest an inability to maintain social relationships, the ALJ's conclusion that Lang experienced less than marked impairment in social functioning is not supported by substantial evidence.

ii.   Concentration, Persistence, or Pace

"Concentration, persistence or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. § 404, Subpt. P, App. 1, at 12.00C(3).  "[M]ajor limitations in this area can often be assessed through clinical examination or psychological testing," but should be supplemented by other evidence where possible.  *Id.*  "On mental status examinations,

---

[17] Without explanation, the ALJ disregarded Dr. Bible's conclusion that Lang's social difficulties were "moderate," and instead assessed them as "slight."  *See* AR at 26, 275.

United States District Court
Northern District of California

1    concentration is assessed by tasks such as having [the claimant] subtract serial sevens . . . from

2    100, [and i]n psychological tests of intelligence or memory, concentration is assessed through

3    tasks requiring short-term memory or through tasks that must be completed within established

4    time limits." *Id.*

5         Here, both Dr. Morse and Dr. Thomsen employed tests assessing concentration,

6    persistence, and pace, as well as memory. Dr. Morse found that Lang scored "Very Low" on two

7    tests of logical memory, and that although Lang's visual memory fell within normal limits, her

8    auditory memory was "markedly impaired." AR at 259–60. Although Dr. Morse reported that

9    Lang "was able to maintain attention, concentration, pace, and persistence for the duration of the

10   examination," Dr. Morse also concluded that Lang's "capacity for mental tracking and sustained

11   attention to task are markedly impaired." *Id.* at 260.

12        Dr. Bible's assessment, based on Dr. Morse's evaluation, is somewhat inconsistent.

13   Despite Dr. Morse's conclusion that Lang's "sustained attention to task [was] markedly impaired,"

14   *id.* at 260, Dr. Bible checked a box indicating that Lang was "not significantly limited" in her

15   "ability to maintain attention and concentration for extended periods." *Id.* at 264. Dr. Bible

16   checked some boxes indicating moderate limitations within the category of "sustained

17   concentration and persistence," *id.* at 264–65, and on her overall evaluation of the Paragraph B

18   criteria, checked boxes indicating both moderate and marked impairment. *Id.* at 275.[18] Dr. Bible

19   noted that Dr. Morse did not provide standard scores supporting many of her assessments. *Id.* at

20   270.

21        Dr. Thomsen's evaluation, which had not yet been completed at the time of Dr. Bible's

22   consulting report, does include standard scores. Lang's score on the RBANS Attention Index fell

23   "in the 1st percentile, which is in the extremely low range," supporting Dr. Thomsen's conclusion

24   that Lang "has a severe deficit" in attention and concentration. *Id.* at 420. Lang was also "not

25   able to subtract a string of sevens starting from 100," *id.*—a test specifically cited in the Social

26   Security Regulations as appropriate for assessing concentration, and also the sort of "simple,

27

28   ─────────────────
     [18] Without explanation, the ALJ concluded that Lang had only moderate impairment with respect
     to complex tasks and "no more than slight" impairment with respect to simple tasks. AR at 26.

United States District Court
Northern District of California

repetitive one or two step task[]" that the ALJ determined Lang could complete without with no more than slight limitation, *id.* at 26. Dr. Thomsen also found "severe impairment" in Lang's memory, noting that Lang "struggled a great deal" with a list learning task scored "in the borderline range at the 5th percentile" on the RBANS Immediate Memory Index. *Id.* at 420−21. Dr. Thomsen attributed Lang's limitations in concentration and attention to Lang's anxiety, depression, and below average intelligence, and concluded that they "may cause her to need an excessive amount of time to complete tasks and may at times cause her to leave tasks uncompleted at a work site." *Id.* at 420, 427. Lang would thus "need extra time to complete tasks and would not work well under a deadline or under even minimal pressure." *Id.* at 427.

There is little evidence of workplace experience to supplemental the medical opinions regarding Lang's concentration impairments. Lang's testimony, however, indicates that her recent work experience consisted of repeatedly sleeping at her security post until she was fired, which does not contradict the psychologists' opinions that Lang had "markedly impaired" capacity for "sustained attention to task," *id.* at 260 (Dr. Morse), moderate to marked impairment of concentration, persistence, or pace, *id.* at 275 (Dr. Bible), and "a severe deficit" of attention or concentration that could be expected to create difficulties in a workplace, *id.* at 420, 427 (Dr. Thomsen). Properly crediting Dr. Thomsen's report, the ALJ's determination that Lang's concentration was less than markedly impaired is not supported by substantial evidence.

### iii. Supplemental Evidence

As part of her request for review by the Appeals Council, Lang submitted a medical assessment form signed by Dr. Howard Edelstein, one of her treating physicians, and dated May 7, 2009—three days after the ALJ's hearing. AR at 30−36. The form primarily relates to Lang's HIV but indicates "anxiety + depression" as symptoms, and includes checked boxes indicating that Lang experienced "marked" restrictions related to daily living, social functioning, and concentration, persistence, or pace, with a brief description of the standards for those categories. *Id.* at 34. The Appeals council denied Lang's request for review and provided no indication whether it had considered this assessment. *Id.* at 1−3. Because the Court now finds that the record that was available to the ALJ is sufficient to establish that his decision was erroneous, the

Court need not consider the level of weight appropriate for Dr. Edelstein's assessment, except to note that it is consistent with the Court's holding that Lang's impairment met the Paragraph B criteria.

Because the record demonstrates that Lang had an impairment or combination of impairments equivalent to Listing 12.04, the ALJ's decision not to find Lang disabled at Step 3 lacked substantial evidence.[19]

### D.    Application of Credit-as-True Rule

The Court concludes that if Dr. Thomsen's report had been credited as true, no substantial evidence would support a finding that Lang's combination of impairments failed to equal a listed impairment. As the ALJ acknowledged before erroneously discrediting it, Dr. Thomsen's report "paints a grim picture of a claimant who is quite significantly limited." *Id.* at 27. Crediting the report, the record thus establishes that Lang is disabled.

As discussed above, the Ninth Circuit's "settled" credit-as-true rule dictates that where the record has been fully developed, the ALJ has failed to provide sufficient reason to discredit a medical opinion, and crediting that opinion would require a finding that the claimant is disabled, a district court usually must remand for an award of benefits. *Garrison*, 759 F.3d at 999, 1019–21. The Court finds that each of those conditions is satisfied here.

One exception to the requirement to award benefits is that a court may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled." *Id.* at 1021. The Court finds that the current record presents no such "serious doubt." *See id.* The closest that the Commissioner comes to establishing serious doubt is in identifying several instances of apparently inconsistent or inaccurate statements by Lang, primarily related to Lang's drug use. *See* Def.'s Mot. at 8–9. In the Court's view, these inconsistencies are not sufficient to warrant further administrative proceedings, particularly given

---

[19] Because the Court concludes that the ALJ should have found Lang disabled at Step 3, the Court need not address the ALJ's analysis at Step 4. The Court notes, however, that properly crediting Dr. Thomsen's report would necessitate changes to the ALJ's analysis. The Court also notes that the ALJ's conclusion that Lang could return to work as a security guard is questionable in light of Lang's testimony that her work experience generally consisted of sleeping at her post.

United States District Court
Northern District of California

that the Ninth Circuit disfavors remand to reassess the credibility not only of medical opinions, but also of claimants.[20]  *See Garrison*, 759 F.3d at 1019−20.  The Court therefore finds that remanding this case for further proceedings would be an abuse of discretion under *Garrison*.[21]  *See id.* at 1020−21.

A second and more narrow exception to the rule discussed in *Garrison* is where the onset date of a claimant's disability is not clear, even crediting the medical opinion at issue as true.  *See House*, 2014 WL 3398137, at *1 (citing, *e.g.*, *Luna*, 623 F.3d at 1035; *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1300 (9th Cir. 1999)).  Under such circumstances, a court should remand for the limited purpose of determining when the claimant's disability began.  Here, crediting Dr. Thomsen's report establishes only that Lang was disabled as of the date of her evaluation—September 17, 2008.  *See AR* at 417.  The beginning boundary of her disability onset date is when she was fired from her job as a security guard in 2007, because the Social Security Regulations establish that Lang was not disabled while she was gainfully employed.  *See 20 C.F.R. § 404.1520(b)*.

"Social Security regulations make clear that determination of a disability onset date is a complex and fact-specific inquiry," *see House*, 2014 WL 3398137, at *1.  The Court cannot conclusively determine from the record when, in the period between the termination of Lang's employment and her evaluation by Dr. Thomsen, her disability began.  The Court therefore remands for resolution of when in that period Lang became disabled.[22]

## IV.   CONCLUSION

The Court finds that the ALJ erred in failing to credit Dr. Ede Thomsen's report and

---

[20] With respect to Lang's credibility, the ALJ's decision includes only the conclusory statement that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible or consistent with the medical findings, to the extent that they are inconsistent with [the ALJ's] residual functional capacity assessment." AR at 28.  The ALJ failed to "make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

[21] One purpose of the credit-as-true rule is to prevent undue delay.  *See Garrison*, 759 F.3d at 1019.  Here, where Lang's administrative hearing occurred more than five years ago, the Court finds that further proceedings to assess credibility would frustrate that purpose.

[22] Given that this Order narrows the window in which Lang's onset date occurred to a period of less than two years, the parties are encouraged to negotiate a stipulated onset date if possible.

United States District Court
Northern District of California

psychological evaluation of Lang.  The ALJ's decision is therefore reversed.  For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Summary Judgment and REMANDS this case to the Commissioner for a determination of Lang's disability onset date and an award of benefits consistent with that determination and this Order.

**IT IS SO ORDERED.**

Dated: September 26, 2014

_____
JOSEPH C. SPERO
United States Magistrate Judge